GREGORY v. PIKE. SAME v. KEMP VAN EE. TALBOT v. PIKE et al.
BUTTERFIELD v. GREGORY et al.

(Circuit Court of Appeals, First Circuit. January 31, 1895.)

Nos. 98–101.

1. ATTORNEY AND CLIENT—LIEN FOR SERVICES.

A suit in equity was brought by one claiming ownership of certain notes to recover possession thereof from a person with whom they had been pledged as collateral security by a third party. Various other par-

ties set up claims to an interest in the notes, and, pending the proceedings, an attorney was employed by the pledgee to bring an action at law, which action resulted in the payment into court of the amount due. This fund was then transferred from the action at law into the registry in the equity suit. *Held* that, as the attorney was employed solely by the pledgee of the notes, he had no lien as against the other parties, upon the fund produced, either before or after its transfer.

2. SAME—STATE AND FEDERAL COURTS.

The federal courts recognize no lien at common law in behalf of an attorney, beyond that given by the local law.

3. PLEDGE—NOTES HELD AS COLLATERAL SECURITY—EXPENSE OF COLLECTION.

One who takes notes as collateral security for a debt is entitled, as against the owner thereof, to be allowed the cost of realizing upon the collateral, including a reasonable attorney's fee for suing upon the notes.

4. SAME—IMPOUNDING OF NOTES—RIGHTS OF PLEDGEE.

Where a suit in equity was brought to recover possession of certain notes which had been pledged as collateral, and which, in the course of the proceedings, were impounded in the hands of the clerk, *held*, that the pledgee was entitled to control the notes so far as necessary for the purpose of bringing an action at law thereon and having the proceeds paid into court; and that it was proper thereafter to have such fund transferred from the law side of the court to the registry in the equity suit.

5. PARTIES IN EQUITY.

One claiming an interest in the subject of litigation cannot ordinarily be made, under the practice of the federal courts, a party defendant, merely upon the petition of the defendant, and against the objection of the complainant; and hence a cross bill filed by a party who thus comes into the cause should be dismissed.

6. SAME—APPEAL.

Where, however, notwithstanding this irregularity, the court enters a decree in favor of the complainant in such a cross bill, there is no reason, on the facts of this case, why, upon an appeal, the appellate court, after deciding that such cross bill should be dismissed, may not regard the same as a summary petition filed by the party himself pro interesse suo, which petition he might have filed in the court below.

7. SAME—COSTS.

Such party, however, having volunteered himself as a party defendant, instead of proceeding by the less expensive method of filing a petition, should be required to pay the costs on the cross bill, both in the appellate court and the court below.

8. REMOVAL OF CAUSES—DIVERSE CITIZENSHIP.

Judiciary Act March 3, 1875, does not contain the restriction which appears in the act of August 13, 1888, touching the residence of the petitioner for removal. The former act is of a broader range than the latter, and the restriction contained in section 1 thereof, prescribing the jurisdiction of the circuit courts, does not apply to removals under section 2. *Held*, therefore, that a cause was removable thereunder when it appeared that each party was a citizen of a different state or of a foreign state.

9. EQUITY PRACTICE — RIGHT OF COMPLAINANT TO DISMISS AS AGAINST ONE OF THE DEFENDANTS.

No such practice as dismissal by an order as of course seems to be known in the federal courts, except under equity rule 66, although it existed in the English chancery at the time its practice was adopted by the supreme court, in cases where the plaintiff was entitled to have his bill dismissed without prejudice.

10. SAME.

An order giving complainant leave to discontinue as to one defendant, "reserving all rights of parties other than said plaintiff," requires further consideration and a formal decree before the dismissal becomes effectual, and for this reason, and because the case is under the control of the court until final decree, such order granting leave may be

subsequently revoked, upon its being made to appear that such dismissal was under a mistake and was not equitable.

11. SAME.

Where a suit was brought by one claiming to be the owner of certain notes pledged as collateral, against the pledgee thereof and the maker, *held* that the complainant had no right to dismiss the bill as to the pledgee after the maker had paid the amount of the note into court and had been dismissed from the case. Chicago & A. R. Co. v. Union Rolling-Mill Co., 3 Sup. Ct. 594, 109 U. S. 702, applied.

12. REHEARINGS ON APPEAL—NEW EVIDENCE — CIRCUIT COURT OF APPEALS—RULE 29.

Petitions for rehearings, in the circuit court of appeals, are regulated by rule 29 (11 C. C. A. cxii., 47 Fed. xiii.), and no new matter can be introduced upon such a petition. Therefore, except in special cases, and then only by leave of court, no papers can be filed except the petition itself in the form prescribed by the rule.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

These were four separate appeals from a decree of the circuit court in the suit of Charles A. Gregory against Frederic A. Pike and others. The cause was originally brought in the supreme judicial court of Massachusetts, December 16, 1884, and was afterwards removed to the circuit court. The original bill sought to recover possession of certain notes which had been pledged as collateral, and to enjoin the payment thereof to the pledgee. Pending the suit the notes were collected by an action at law, and the proceeds transferred to the registry in this cause. At various times additional parties came into the suit, in the manner more fully stated in the opinion of the court. The facts out of which the controversy arose were substantially as follows:

In 1880 or 1881, one George W. Butterfield, who owned an interest in certain mining property, including the May Lundy mine and the Lake View and Lucky Morton mines, situated in Mono county, Cal., sold the same to Frederic A. Pike, of Calais, Me. Afterwards, Butterfield conceived the plan of organizing a mining company in London or elsewhere, and selling to it the property in question. To this end, on January 29, 1883, he made a contract with said Pike for the purchase of his interest in the mines. This contract by its terms was to expire on July 30, 1883, unless the purchase was completed by that time. Butterfield, being without funds, associated with himself one Charles F. Jones, who made a cash payment under the contract with Pike. Afterwards, for the purpose of providing funds for carrying out the scheme, Butterfield and Jones approached the complainant Charles A. Gregory and one J. C. Kemp Van Ee, who each owned a large amount of stock in the Great Sierra Consolidated Silver Mining Company. As a result of their negotiations, Gregory transferred to Butterfield 80,000 shares of said stock, and Kemp Van Ee 79,000 shares. At the time this assignment was made, Butterfield gave to Gregory the following receipt or declaration of trust:

"Boston, March 30, 1883.

"Received of Charles A. Gregory 80,000 shares of the stock of the Great Sierra Consolidated Silver Company of Chicago, Illinois. I take the same to have it registered upon the books of the company in the name of George W. Butterfield, of San Francisco, as trustee, and I will deliver the same to said Gregory on demand, and in the meantime hold the same in trust for him as his property.        G. W. Butterfield."

Afterwards, and on April 7, 1883, the following written agreement was executed between Butterfield and Jones on the one part and Kemp Van Ee on the other:

"Memorandum of agreement between George W. Butterfield and Charles F. Jones, parties of the first part, and J. C. Kemp, party of the second part, and all of the city and county of San Francisco, in the state of California: Whereas, said parties of the first part have purchased the May Lundy, Lake

View and Lucky Morton mines, situate in New Homer mining district, Mono county, state of California, for the sum of two hundred and fifty thousand dollars lawful money of the United States, upon the following conditions, to wit: Ten thousand dollars cash, and the balance on or before the 30th day of July, A. D. 1883; and whereas, said parties of the first part have bonded various other properties in said district from one Howk, one Carpenter, and one Gilchrist, and also contemplate bonding other properties to be included; and whereas, it is the purpose, desire, and intention of the said parties of the first part to sell all or a part of said properties either in the United States or Europe, upon such terms and conditions as they may think advantageous for all parties to this agreement: Now, this agreement witnesseth that said parties of the first part, for and in consideration of the sum of ten thousand dollars, lawful money of the United States of America, to them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, and the further consideration hereinafter mentioned, do hereby covenant and agree to and with the said party of the second part to give him, the said party of the second part, a one-eighth (⅛) part of all the moneys or values realized from the sale of said May Lundy, Lake View, and Lucky Morton mines, over and above the price paid for the same; also an eighth (⅛) part of all the moneys or other values realized from the sale of said mines bonded from one Howk, one Carpenter, and one Gilchrist or others included in this sale. It is further agreed that, in case said mining properties are not sold or otherwise disposed of, then the said parties of the first part shall assign, transfer, and set over to said party of the second part an undivided one-eighth (⅛) part of all the mines now bonded from said Howk, Carpenter, and Gilchrist. It is further agreed, by and between the parties of the first and second parts to this agreement, that said party of the second part shall devote his time and energies in assisting said parties of the first part to make a sale of all or any part of said mining properties, under and subject to the direction and approval of said parties of the first part or either of them. It is further agreed by and between the parties of the first and second parts that the expenses of said party of the second part pending said negotiations shall be defrayed by said parties of the first part.

"In witness whereof we have hereunto set our hands and seals this ——— day of ———, A. D. 1883.                    G. W. Butterfield.    [Seal.]
"Chas. F. Jones.    [Seal.]
"J. C. Kemp.    [Seal.]

"Witness present: J. H. Moyle."

Early in April, 1883, Butterfield sold the entire 159,000 shares of stock in the Great Sierra Consolidated Mining Company which he had acquired from Gregory and Kemp Van Ee to one W. C. N. Swift, of New Bedford, Mass., receiving $10,000 in cash, and four notes, aggregating over $80,000. These notes were made payable to the order of Butterfield, and were negotiable. On April 9th, two of these notes, each for $20,334.60, were delivered by Butterfield to Gregory. On the same day Gregory passed the notes back again to Butterfield, who then delivered them to Jones. Upon receiving back the notes, Butterfield gave Gregory the following agreement or declaration of trust:

"New York, April 9th, 1883.

"I hold in my hand notes of W. C. N. Swift, dated New Bedford, Mass., 1883, 4m. 4th, one due two years after date for $20,334.60, one due three years after date for $20,334.60, payable to order of Geo. W. Butterfield, with interest at six per cent. per annum. These two notes belong to Chas. A. Gregory, and the proceeds of them; and I agree to deliver the same to him upon request, or the full amount of money expressed therein; and I also owe an account and payment to said Gregory for $730.80, being his pro rata of the two other notes of similar description held by me belonging to J. C. Kemp. Gregory is entitled to one-half of this $730.80 in two years, and one-half in three years, with interest as above.        G. W. Butterfield."

On April 20, 1883 (Butterfield, Gregory, and Kemp Van Ee, being then in England, for the purpose of promoting the organization of a company to

take the mines), Jones surrendered all four of the notes to Swift, the maker, and in place thereof received five other notes, payable to the order of Jones, three of which were nonnegotiable. The contract of purchase with Pike expired before the scheme was consummated. Butterfield, in the meantime, had returned to America, and on July 31, 1883, he entered into a new contract of purchase with Pike, the purchase price being $242,666, payable $25,000 in cash, and the balance on or before the 1st day of January, 1884; but at the foot of the contract there was appended the following modification in respect to the cash payment:

"For the first payment of $25,000, specified in the above agreement, the said Butterfield has lodged in the hands of said Pike the notes of W. C. N. Swift, of New Bedford, dated April 20, 1883, for $15,000 and $20,334.60, payable in two and three years from date, which notes are to be held by said Pike until Jan. 1, 1884, unless sooner redeemed by said Butterfield by the payment of $25,000, and at that time the said Pike is authorized to raise $25,000 out of them by pledging them on the most favorable terms he can obtain.                                    F. A. Pike.
                                                                "G. W. B."

The notes thus pledged with Pike were two of the nonnegotiable notes made by Swift to Jones, and it is in respect to them that the suit was brought. The contract under which they were pledged, like the one which preceded it, was not complied with by Butterfield and his associates; and, according to its terms, all payments made before the expiration thereof were to be forfeited to the said Pike. Gregory, in his amended bill, and also in his testimony, alleged that the contract of July 31, 1883, was not an extension or renewal of the contract of January 29, 1883, but was a new contract, made without his knowledge, and in which he had no interest whatever, either as partner with Butterfield and Jones, or in any other way; and it appeared that on December 15, 1883, Gregory had procured from Butterfield the following order upon Pike for the delivery of the notes:

"F. A. Pike, of Calais, Me., U. S. A.—Dear Sir: Please deliver to Charles A. Gregory, of Chicago, Ill., or to his order, the note made by W. C. N. Swift, of New Bedford, dated April 20, 1883, for $15,000, payable in two years from its date, placed in your possession by me, the same being the property of said Gregory now and at the time I placed the same in your possession.                                    G. W. Butterfield."
"London, Dec. 15, 1883."

Butterfield, in his answer in the cross bill, alleged that the contract of July 31, 1883, was a mere renewal of the previous contract, which had expired; that it was made for the benefit of all the associates; and that they were in partnership, sharing in the benefits and burdens of the contract. In the cross bill of Butterfield it was alleged that the original notes made by Swift to him "were both in law and in equity his notes, to be used by him as the best interest of said associates might require; that he had full right to deliver said notes to said Jones to be used for the purpose aforesaid; and that said notes were properly deposited with the said defendant Pike." The cross bill contained also the following allegations: "Your orator further shows unto your honors that the expenses of said associates in their endeavor to carry out their scheme have been very large; that the amount received from the other notes of said Swift has been insufficient to pay such expenses; that your orator intrusted with said Gregory a large amount of money received from the discount of said two notes for the purpose of paying the debts of said associates, but the said Gregory converted the same to his own use, by reason whereof your orator paid said debt from his own resources," etc. In respect to the assignment made to him by Gregory of the 80,000 shares of Sierra Company stock, Butterfield alleged in his cross bill that it was expressly understood and agreed that the assignment was for the purpose of enabling Butterfield to raise money to carry out the scheme, and that the receipt given by him at the time of the assignment of the stock was merely as a security for the reassignment of the same in case it was not sold for the purpose stated. He further alleged that Gregory had the same interest in the project that Kemp Van Ee held

under the written contract of April 7, 1883; that the receipt or declaration of trust given by him to Gregory in relation to the Swift notes was a mere memorandum to be held by Gregory until a written contract, in the same form as that with Kemp Van Ee, could be made; that afterwards, and about the 9th of May, 1883, Gregory in fact accepted a contract in writing in that form; and that thereupon the memorandum of April 9th was discharged. Upon these allegations Butterfield prayed, in his cross bill, that he might be declared entitled to the proceeds of the notes for the purpose of adjusting the claims of all the associates, and especially for the purpose of reimbursing himself for the money advanced by him to Gregory to pay the debts of the associates, which he had alleged that Gregory misappropriated to his own use. Kemp Van Ee, having been made a party to the suit, filed an answer and also a cross bill, showing that by reason of the relations of the parties, and the use made of the stock which he had transferred to Butterfield in pursuance of the scheme, he was entitled to one-half the proceeds of the $15,000 note in controversy in the case.

Francis A. Brooks, for Gregory.
John Lowell and Thomas H. Talbot, for Mary H. Pike.
A. Lawrence Lowell, for Kemp Van Ee.
Thomas H. Talbot, pro se.
George D. Noyes, for Butterfield.

Before PUTNAM, Circuit Judge, and WEBB and CARPENTER, District Judges.

PUTNAM, Circuit Judge. These four cases are appeals from the decree of the circuit court in a bill in equity originally brought in the supreme judicial court of Massachusetts and removed to the circuit court. The bill was brought by Gregory against Frederic A. Pike, the testator of the present respondent, Mary H. Pike, and against William C. N. Swift, to recover two certain nonnegotiable promissory notes, made by Swift, and held by Mr. Pike, and alleged by Gregory to be his own property. On the petition of Swift and John C. Kemp Van Ee, who claimed to be interested in the notes, Kemp Van Ee was made a party respondent by order of the court, and against the objection of Gregory. He then filed a cross bill, in which the respondents were Mr. Pike and Swift, and also George W. Butterfield. Butterfield has been made a defendant on the application of himself and Swift, but there is no assignment of error touching this. He claimed an interest in the notes, and filed a cross bill, in which his interest is alleged as will hereafter appear. The notes were finally impounded in the hands of Mr. Stetson, then clerk of the circuit court, and afterwards such proceedings were taken that actions at law in the name of the payee of the notes were brought on the law side of the circuit court by Thomas H. Talbot, as attorney for Mr. Pike and his estate, and judgments obtained, which were paid into court by Swift, and the proceeds were transferred to the registry in this cause.

The cause came to final hearing, and a decree was made as follows, on the 8th day of March, 1894:

"(1) That from the fund in the registry of the court in this cause there be paid to the clerk of this court, as required by law in such case, one per cent. upon the whole of said fund. (2) That there be paid from said fund to the administrator of the defendant Swift, deceased, costs, to be duly taxed in favor of said defendant. (3) That for special services in connection with

said fund, as set forth in his petition, there be paid to John G. Stetson the sum of eight hundred dollars. (4) That there be paid to the defendant John C. Kemp Van Ee one-half of the proceeds of the fifteen thousand dollar note, with the accumulations thereon. (5) That there be paid to Mary H. Pike, executrix of the original defendant, Frederic A. Pike, since deceased, the sum of twenty-five thousand dollars, with interest thereon from January 1, 1884, if the fund remaining in the registry of the court shall be sufficient for the payment, and, if not sufficient, the balance of said fund. (6) That the cross bill of the defendant George W. Butterfield be dismissed. (7) That, after the payments hereinbefore decreed to be made to said clerk, the administrator of Swift and Stetson, and the amounts decreed to be paid to Kemp and Pike, as hereinbefore provided, the remainder of the fund, if any, be paid to the plaintiff Charles A. Gregory."

It appears, by a comparison of the amounts thus decreed with the amount in the registry, that nothing will remain to be paid Gregory under the seventh clause of the decree. From this decree appeals have been taken by Gregory and Butterfield. Mr. Talbot, also, having filed in the court below a petition for an allowance for his counsel fees and costs out of the fund, appeals from the decree because there was no allowance of the former. We will proceed to examine such of the assigned errors in this decree as have been presented in the argument, so far as such examination seems necessary, in order to reach a conclusion on the appeals; and we will first refer to the petition of Mr. Talbot.

He was employed by Mr. Pike and his estate to collect the notes which produced the fund now in the registry of the court. He was not employed, either expressly or by implication, by Gregory. He was, moreover, not employed by Kemp Van Ee or Butterfield. He seems to have been acting throughout solely in the interest of Mr. Pike and of his estate. Therefore on no principle of law has he any claim except against them, or on their interest in the fund. By the thoroughly settled law in Massachusetts, he had no lien on the fund while on deposit on the common-law side of the circuit court, except for his taxable costs. All the cases cited by Mr. Talbot to establish a lien relate to the compensation of a trustee or his attorneys, or otherwise to the administration of a trust estate, or are of that kind wherein one person in a class of persons interested, having secured the fund for the common benefit, is entitled to be reimbursed his legal expenses out of it, and there seems to be no other lien in equity. Meddaugh v. Wilson, 151 U. S. 333, 14 Sup. Ct. 356, is the latest case of this class.

There is no federal case establishing a lien at common law in behalf of an attorney beyond that given by the local law. The extent of the lien, therefore, of Mr. Talbot, while the fund was on the law side of the court, was his bill of costs. The transfer of the fund to the equity side of the court did not change the legal rights of any person in the fund, so that the extent of Mr. Talbot's lien was precisely the same after the transfer as before. So far, however, as that part of the fund is concerned in which Kemp Van Ee has no interest, it is the proceeds of notes which Mr. Pike held as collateral, and his estate is entitled to be allowed, as against Gregory, the cost of realizing the collateral. This is a clear principle of law. Therefore the decree below should have allowed Mrs. Pike, in addi-

tion to the amount of her claim and interest, the expenses of herself and Mr. Pike in realizing the fund, including the reasonable charges of Mr. Talbot; and this allowance should rank first against the proceeds of that part of the notes which belonged to Gregory. As Mrs. Pike makes no objection, the decree in this particular may run in favor of "Thomas H. Talbot, attorney of Mary H. Pike."

In regard to the appeals of Gregory, the assignments of errors disclose no controversy as to the merits of the decision of the court below. They relate solely to matters of procedure during the progress of the suit, and to a claim that the circuit court had no jurisdiction to determine the controversy. We will state these points so far as it seems necessary to discuss them.

As to the collection of the notes which were in Mr. Stetson's hands, and the transfer of the funds from the law side to the equity side of the circuit court, some of the steps will be stated in another connection. Mr. Pike had a right, as against Gregory, to put the notes in judgment, and to realize the judgments, at least to the extent of having the fund paid into the common-law side of the court; and he had a right to control the notes so far as necessary for that purpose. Independently of the orders of the circuit court, it was the duty of Stetson to permit the notes to be made available. If those orders were authorized, Stetson was required to comply with them. If not authorized, Stetson must be considered as having done voluntarily what he could have been required by Mr. Pike to do by some suitable proceeding; and there can be no question that, in some way, Mr. Pike, or his estate, could have compelled Stetson to make the notes available for the purpose of obtaining judgments against Swift and a realization of the judgments. And, when this had been accomplished, the prayer against Swift, contained in Gregory's original bill, justified, and, indeed, required, for Swift's protection, that the fund should be brought into the court in equity. The most orderly method to accomplish this result, in the absence of the consent of all parties, would, perhaps, have been to have made some person receiver of the notes, and directed him to collect them, and pay the proceeds into the registry of the court in equity. What was done accomplished the same result in a less expensive manner. As the objections relate, not to the method of doing it, but to the doing of it at all, it is not necessary to consider them further.

As to the proceedings by which Kemp Van Ee was made a defendant in Gregory's bill, and permitted to file a cross bill, Swift, who was a defendant, petitioned that Kemp Van Ee should be made a defendant, and Kemp Van Ee also petitioned to be made defendant, and both petitions were allowed; so that he properly stands as a defendant, if he could be made such, either on the petition of Swift or on his own. It now appears that Kemp Van Ee had an interest in the notes in Swift's hands, and there is no doubt that Swift was entitled to be protected against this claim, if he proceeded in due form. One due form was to file a bill of interpleader, and pay the amount of the notes into court, and bring in nonresident parties, as provided in the act of March 3, 1875, c. 137, § 8 (18 Stat. 473); Greeley v. Lowe, 155 U. S. 58, 15 Sup. Ct. 24. If Gregory's bill had then been

pending, Swift might have brought his bill of interpleader in the circuit court, under the rulings in Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, and Morgan's L. & T., etc., Co. v. Texas Cent. R. Co., 137 U. S. 171, 11 Sup. Ct. 61. Then, on motion, the circuit court would either have consolidated the two suits, or postponed Gregory's case until the interpleader was disposed of. In this way Swift would have proceeded according to the well-settled practice in an orderly manner, and there would have been proper pleadings covering all questions which could arise.

In the way attempted in the present case, there are no pleadings on behalf of the original plaintiff as against Kemp Van Ee, and could be none. The whole basis of making him a party defendant was in the allegations of Swift's answer. This practice, although prevailing in some localities, is condemned, by necessary implication, in Shields v. Barrow, 17 How. 130, 145, by Justice Bradley, in 1873; in Searles v. Railroad Co., 2 Woods, 621, 625, Fed. Cas. No. 12,586; by Justice Blatchford, in 1868, in Drake v. Goodridge, 6 Blatchf. 151, Fed. Cas. No. 4,062; and in the notes to Daniell, Ch. Prac. (6th Am. Ed.) 286, 287. Some of the reasons for this are highly meritorious, others technical,—meaning not technical in the narrow sense of the word, but in its better sense.

First. Complainants ought not to be compelled into litigation with parties not of their own seeking. One may commence a proceeding very simple in its nature, and be content to take the risk of it; but, if other persons can force themselves into the litigation, what he conceives to be simple may become complicated, expensive, and interminable.

Second. There are ample remedies in case the plaintiff fails to unite all parties required to do equity, either by a bill of interpleader, or in the methods pointed out by Judge Curtis in Shields v. Barrow, ubi supra. Therefore there is no occasion to resort to the extraordinary proceeding of making new parties without complainant's consent.

Third. As already said, a case made up as this was presents no proper issue on which to base proofs for the determination of the court. This is not technical, in the narrow sense of the word, but leads to extraordinary results, as will be seen by reference to the next paragraph.

Fourth. The result which may come from bringing in a defendant, as was done in this case, shows the impropriety of it. A defendant thus brought in answers, and complainant refuses to file a replication. The only remedy is for the defendant to move a dismissal as against himself. The result is that he is dismissed from the case, and the case stands exactly as it did before he was brought in. Thus, by failing to reply, the plaintiff is able to bring the bill into its original state. It cannot be said that this can be avoided by setting down the case to be heard on bill and answer, because, as already said, there are no proper allegations on behalf of the new defendant which would enable this to be effectually done.

It is true that in the case at bar, if Kemp Van Ee was properly made a party, he was able to file a cross bill; so that, although the

original bill was dismissed as to the new defendant, bringing him in would not necessarily fail of results. We must, however, judge of the question by general rules, applicable to suits where there would be no basis for filing cross bills. In England, legislation was necessary to accomplish what was attempted in this case by making Kemp Van Ee a defendant, and under that legislation proper orders have been passed, requiring an amended statement, so as to raise a proper issue as against defendants brought in by other defendants. So admiralty rule 34 provides proper pleadings in the case of an intervener, but no equity rule meets the difficulty on this point in the case at bar.

This question of making defendants is entirely different from that of an intervention pro interesse suo, as authorized in Harrison v. Nixon, 9 Pet. 483, 540; Krippendorf v. Hyde, ubi supra; and in Morgan's L. & T., etc., Co. v. Texas Cent. R. Co., ubi supra; and in the notes to Daniell, Ch. Prac. (6th Am. Ed.) 1853. There seems to be no doubt that, under the authority of these cases, Kemp Van Ee would have been entitled to an intervention by summary petition after the fund came into the registry of the court in equity, and to thus maintain his interest. This, however, would have been an essentially different proceeding from that of making parties to the main controversy, and would have been of the character of the intervention of Mr. Talbot in the case at bar. This question has no relation to the so-called "class suits," nor to the coming in of a cestui que trust or a stockholder, nor to cases like White v. Hall, 1 Russ. & M. 332, where new parties come into the accounting after a decree. In none of these are the issues presented by the bill substantially changed by the interposition of the new parties.

As Kemp Van Ee was improperly made a defendant, it follows that his cross bill was unauthorized, and should be dismissed. So far as the original bill was concerned, he was dismissed from it on his own motion under equity rule 66; so that, when his cross bill is dismissed, the irregularity will have been wholly obviated. In King v. Asylum, 12 C. C. A. 145, 64 Fed. 331, the authorities to the effect that an irregularity, subsequently obviated, is not ground for a reversal or modification, were collected, and the rule was reaffirmed. On the principles and cases already referred to, Kemp Van Ee was entitled, at some stage of the cause below, after the fund was accumulated in the registry of the court in equity, to intervene pro interesse suo by summary petition. There is no rule touching the merits or the necessities of technical proceedings which prevents this court from regarding his cross bill as such a petition. His interest is not disputed by Pike or Gregory, at least so far as these appeals are concerned. There is no error in reference thereto assigned by them, and none suggested by their counsel. As no error has been assigned to the effect that Butterfield's cross bill was not properly filed, so that nobody objects to it, the issue made by him can properly be determined by this court on the present record, and the interest of Kemp Van Ee in the fund, and the extent of it, be thus determined as between all parties. This court may, therefore, on the principles already laid down, treat the cross bill of Kemp

Van Ee as in effect a petition to intervene, and confirm the decree in his behalf for the amount determined to be due him.

As, however, he volunteered himself as a party defendant, and brought a cross bill, instead of the more summary and less expensive proceeding by a petition, he ought to be required to pay costs on the cross bill in this court and in the court below. The court perceives no ground on which any question of jurisdiction can be raised. The removal from the state court was under the act of March 3, 1875, c. 137, § 3 (18 Stat. 471), and an examination of the papers shows it was correctly made. The provision touching the residence of the petitioner for removal, found in the act of 1888 (Martin v. Snyder, 148 U. S. 663, 13 Sup. Ct. 706), is not found in the act of 1875; and the act of 1875 has a range so broad that the restriction contained in section 1 does not apply to removals under section 2. Claflin v. Insurance Co., 110 U. S. 81, 3 Sup. Ct. 507. Each party was a citizen of a different state, or of a foreign state, so that in every aspect there was a controversy "between citizens of different states," or "between citizens of a state and foreign citizens or subjects." The jurisdiction being otherwise sufficient, any difficulty arising from residence may always be waived under any of the statutes. Railway Co. v. McBride, 141 U. S. 127, 11 Sup. Ct. 982; Shaw v. Mining Co., 145 U. S. 444, 453, 12 Sup. Ct. 935; Southern Pac. Co. v. Denton, 146 U. S. 202, 206, 13 Sup. Ct. 44.

The objections made on behalf of Gregory, that the bill filed by him January 10, 1887, was treated by the court as a supplemental bill, and that that bill and the original bill were held to be one cause, and were retained as against Mary H. Pike, involve matters as to which he can make no complaint. He made her a party, and in the form and at the time which he himself elected, and he expressly described the bill filed January 10, 1887, as in the nature of a supplemental bill. It clearly was supplemental in all its aspects. Gregory cannot take any advantage of errors of his own creating, if there were any in these matters.

On the application of Gregory for leave to discontinue as against Mary H. Pike, filed September 19, 1890, leave was granted, with the following qualification: "Reserving all rights of parties other than said plaintiff, acquired by reason of said Mary H. Pike having been made a party defendant." This leave was granted January 24, 1891. October 30, 1890, Gregory filed an order as of course, dismissing his bill against Mrs. Pike. No such practice as dismissal by an order as of course seems to be known in the federal courts, except under equity rule 66, although it existed in the English chancery, at the time its practice was adopted by the supreme court, in cases where the plaintiff was entitled to have his bill dismissed without prejudice. The dismissal stands on the order entered by the court on Gregory's petition, and this order was entered, not as of course, but in view of all the equities. It subsequently appeared to the court on the petition of Mrs. Pike, filed May 1, 1893, that the dismissal was under a mistake, and was not equitable, and therefore it was revoked. This, of course,

was within the power and reasonable discretion of the court below, unless for one of two reasons, namely: First, that the dismissal ended the litigation as to her, and that, as several terms had elapsed before she was restored to the case, the court had no power thus to restore her; second, that, at the stage of the litigation at which the bill was dismissed as against her, plaintiff had a right to have the bill so dismissed without prejudice, so that the dismissal was a matter of right, and not of equitable consideration, and the court had no power, therefore, to rescind the order.

As to the first, no formal decree had been entered dismissing as against her. The phraseology of the order of the court, "reserving all rights," required further consideration and a formal decree, before the dismissal was effectual; and, independently of this, the case was under the control of the court until the final decree was entered, March 8, 1894.[1]

So far as the second point is concerned, the state of the case when the dismissal was entered was as follows: There had been the cross bill filed by Butterfield, in which Mary H. Pike, as executrix, was made a defendant, it had been answered by her, replication filed, and evidence taken and filed. In Chicago & A. R. Co. v. Union Rolling-Mill Co., 109 U., S. 702, 3 Sup. Ct. 594, Bank v. Rose, 1 Rich. Eq. 294, is cited with apparent approval. In that case a cross bill had been filed, and affirmative relief asked for, and the case prepared for hearing, and it was held that the motion to dismiss could not be granted. The following proposition, however, seems decisive. Gregory's original bill was filed before either of the Swift notes came due, and it prayed no relief against Swift, except that he should be enjoined from paying to any other person than Gregory. The supplemental bill, however, prayed direct relief against Swift, to the effect that Swift might be ordered to recognize the right of Gregory to collect and receive the amount of the judgment which had already been entered in the suit at law on the note of $20,334.60, although no special relief was prayed against him as to the note of $15,000. At the time of the filing of the supplemental bill, Swift had already paid into the registry of the court, in the suit at law, the amount of that judgment. On the law side of the court an order was entered, January 10, 1887, that the above amount be transferred to the equity side in this cause, and remain subject to the order of the court in that connection. No corresponding order seems to have been entered by the court in equity, but a copy of this order was ordered to be filed on the equity side on the same day. The transfer of the fund, moreover, was recognized by all parties, because it appears that March 26, 1887, Gregory moved in the equity cause that it be deposited with the Boston Safe-Deposit & Trust Company, and an order was entered directing $24,000 to be thus deposited, the order showing that all parties in interest consented.

---

[1] See Bank v. Smith, 156 U. S. 330, 15 Sup. Ct. 358, decided since this opinion was announced.

It thus appears that Swift had indirectly paid into the registry the amount of the larger note and interest, subject to the disposal of the court in this cause. Further, he afterwards, in the same indirect way, paid into the registry of this court in this cause the amount of the $15,000 note. Thereupon, Swift having in effect complied with all the relief prayed for against him, and being no longer personally needed in the cause, the bill was dismissed as against him, October 19, 1889, the order stating that no objection was made. The effect of these proceedings we have already referred to. The result was not at all like ordinary interlocutory orders, by which persons not parties to the issues in the bill pay money into court, because, in this case, Swift was made one of the defendants; so that all issues which could affect Swift were disposed of, and the bill had, therefore, passed the stages subsequent to which, according to the opinion of the supreme court in Chicago & A. R. Co. v. Union Rolling-Mill Co., ubi supra, a plaintiff has not the right to require that his bill be dismissed. The result was that, at the stage of the case at which the bill was dismissed as against Mrs. Pike, it could only have been dismissed on equitable grounds, by the consent of the court; and the court perceiving that the supposed equitable grounds for dismissal did not exist, and that the dismissal was in fact inequitable, had the right, so long as it retained control of the case, to revoke its order.

As Butterfield was the appellant on his own bill, Gregory is not limited by any assignment of errors in relation thereto. It is too clear to require discussion that Butterfield's bill was strictly a cross bill, and that the parties were correctly made, as they included the parties to the original bill and none others. Kemp Van Ee should not be held to be such a party, and was correctly not joined. Gregory's objections in relation to the service made on Butterfield's cross bill, and as to the general right to entertain jurisdiction of such bills, are clearly not well founded. All his other objections are rendered immaterial by our determinations of other parts of the case.

Butterfield's assignment of errors on his appeal, Nos. 9 and 10, set out that the proceeds of the notes should have been held subject to an accounting by him. This probably means "to" him. They complain that the decree does not recognize the notes as partnership property, or as property to be used for the adjustment of equities between partners. The assignments do not conform to the case made for Butterfield, either in his cross bill or in his answer to Gregory's bill, or his answer to Kemp Van Ee's cross bill or his deposition. In his cross bill he says the notes were, both "in law and equity, his notes, to be used by him as the best interests of such associates might require." Although this alleges nominally a title in himself, yet it is such a title as would be held to make him a trustee of them, and not an owner in his own interest or a holder of them in any partnership relationship. His answer to Gregory's bill is to the same effect. He there says that the shares of stock in the Sierra Company, of

which the notes were the proceeds, were given to him, "to be used by him, and sold, if possible, for the purpose of raising money to be used in promoting the interests of all,"—that is to say, Gregory, Kemp Van Ee, Jones, and Butterfield,—in carrying out the scheme out of which arose the contract with Pike.

Neither the cross bill nor the answer sets out facts constituting a partnership in the notes. Their sensible and fair construction, taken as a whole, is that the Sierra stock, and the notes which were the proceeds of it, were placed in Butterfield's hands to be used by him to raise money to advance the common scheme; that, therefore, so far as they were used for that purpose, they were legitimately used; that, subject to whatever liens might thus be imposed on them, they remained always the property of Gregory and Kemp Van Ee; so that they always had the right to recover them by paying off the liens; and that, finally, as there is no lien on them except the pledge to Mr. Pike, Gregory and Kemp Van Ee have a right to redeem them, or their proceeds, from his estate, and when redeemed they become their property.

None of Butterfield's statements are supported by anything aside from his own deposition, except the deposition of Guy. This, even, if accepted without reservation as to all the facts concerning which Guy had any personal knowledge, would be of no weight against the great mass of facts in the case, as it relates only to an incidental matter; but Guy was a solicitor, and had, at least, some general knowledge of the rules governing the conduct of witnesses, and his disregard of them renders his deposition worthless. Against the deposition of Butterfield are those of Gregory and Kemp Van Ee, which are supported by four important documents, each of them of principal, and not of subordinate or incidental, character, and clearly showing that Butterfield had no interest in the notes. These are Butterfield's receipt to Gregory of March 30, 1883, for the Sierra stock, his acknowledgment touching the notes to Gregory of April 9, 1883, his order on Pike for the notes of December 13, 1883, and the unanswerable contract of April 7, 1883. The claim of Butterfield is in no way established, and we fully concur with the conclusions of the circuit court touching it. As he had no interest in the notes, he goes wholly out of the case, and all his other alleged errors become, of course, irrelevant.

It is ordered that Thomas H. Talbot, attorney for Mary H. Pike, executrix, recover the amount for services asked for in his intervening petition; that the amount so recovered rank as explained in the opinion filed this day in this case; that the cross bill of Kemp Van Ee stand as an intervening petition pro interesse suo; that Mary H. Pike, executrix, recover her costs against Gregory in this court and in the circuit court; that Gregory recover his several costs against Butterfield and Kemp Van Ee on their cross bills, both in this court and in the circuit court; that no other costs be recovered in either court, except as expressly stated in the decree entered in the circuit court March 8, 1894; that Mary H. Pike, executrix, and Kemp Van Ee be allowed, respectively,

accumulations and interest to the time of the entry of the final decree, on the rules applied to him or her in said decree entered said March 8th; and that the case be remanded to the circuit court, with directions to enter a final decree conforming to this order so far as it goes, and in all other respects to said decree entered March 8, 1894.

(March 21, 1895.)

Petitions for a rehearing have been filed by appellants Gregory and Butterfield. The court finds nothing in the petition filed by Butterfield, except what has been fully considered by it, barring the fact that some reference has been made to evidence which it is said was not rightfully read in the case. As to this, it is sufficient that no such question was raised in the court below, and therefore it cannot be raised in this court. In the petition for a rehearing filed by appellant Gregory as against Pike, it is insisted that the court has overlooked the point made by Gregory touching the alleged abatement of his original bill. This was rendered unimportant by what was held in our opinion with reference to his bill filed January 10, 1887. The petition also insists that this court overlooked the order passed July 9, 1887, touching the $15,000 note. The petitioner is mistaken, as the opinion of the court covers both notes. It is also insisted that an award of $25,000, with interest, has been made to Mary H. Pike, "in the absence of any claim asserted by her in any formal manner to said amount, or to any amount whatever, and in the absence of any proofs of petition or pleadings, or evidence offered by her." In the absence of any precise definition, this may be taken very broadly or very narrowly. There is no assignment of error touching it, unless it be the fifth, which, unless limited by the specifications following it, is so broad that, by the practice of the courts of appeals in all the circuits, this court is not bound to search through the record on account of it. It may be presumed that this proposition in the petition for a rehearing relates to a claim made at the original hearing, that, under the pleadings, neither Mr. Pike, nor his estate, could obtain a lawful recovery or decree against any one anywhere, and that the decree of the circuit court provided for no right of redemption on the part of Gregory as pledgee. If the decree in favor of Mary H. Pike was personal against any individual, and not limited to the fund, the error would be so palpable that this court might be obliged to consider it, even under very inartificial assignments. But the decree does not take on that character; and the rest of these suggestions, in the absence of any specific assignment touching them, are too technical to require our attention.

The petition also requests the court to state on what ground it made its decree in favor of Mary H. Pike. Inasmuch as we had no occasion to pass on the merits of the claim of Mary H. Pike, it is beyond our province to attempt any explanation of the grounds on which the merits were decided in her favor by the court below. For all those matters the appellant Gregory is referred to the proceedings and decrees of the court below. Not only do our rules limit an

appellant to his assignment of errors, but they provide that his brief shall exhibit a clear statement of the points of law or fact to be discussed. Without a fair compliance with these requirements, it would be impracticable for this court to perform its work understandingly. In order that the petition for a rehearing should obtain respectful consideration, we have carefully gone over anew the assignment of errors filed with the appeal, and also the points stated in the brief at the original hearing of the appellant Gregory, and find that all the points raised were covered by our opinion, so far as they were within the scope of the errors assigned, except, also, so far as the disposition by us of some points rendered it unnecessary to consider certain others.

Attached to appellant Gregory's petitions for a rehearing are certain affidavits. The petition as against Mary H. Pike refers to new matter, which it is said has been learned by the appellant Gregory since the argument of the appeals in this court. We have not examined the affidavits to ascertain whether or not they sustain this statement. Since the decision of the supreme court in Brown v. Aspden, 14 How. 25, holding that a rehearing is not a matter of right, petitions for rehearings in the supreme court are held to be regulated by rule 30 of that court (3 Sup. Ct. xvi.), and, consequently, in this court must be held to be regulated by our rule 29 (11 C. C. A. cxii., 47 Fed. xiii.). It is thoroughly settled that on a petition for a rehearing in the supreme court, especially in an equity cause, and by consequence in this court, no new matter can be introduced. Russell v. Southard, 12 How. 139, 159; Maxwell Land-Grant Case, 122 U. S. 365, 375, 7 Sup. Ct. 1271. The practice, of course, is less strict in the circuit court, or other courts of the first instance. Therefore, except in special cases, and then only after leave is granted by the court, no papers can be filed under rule 29, or as a petition for rehearing, except the petition itself in the form provided by that rule. The clerk was not authorized to file the affidavits without leave of court first obtained, and they cannot be considered by us. If any new matters have arisen changing the equities, probably due relief will be found, but it is not in this form; and, according to the general practice in equity, it cannot ordinarily be applied for in any form which will delay the final disposition of an appeal, or the execution of the judgment following therefrom. Southard v. Russell, 16 How. 547; Ricker v. Powell, 100 U. S. 104, 108; Gaines v. Rugg, 148 U. S. 228, 242, 13 Sup. Ct. 611; Watson v. Stevens, 3 C. C. A. 411, 53 Fed. 31; Smith v. Weeks, 3 C. C. A. 644, 53 Fed. 758; Daniell, Ch. Prac. (6th Am. Ed.) 1582.

In the petition for a rehearing filed by appellant Gregory, as against Kemp Van Ee, the fifth assignment of error is reiterated; but in this connection the petition seems to assent to the view that its expressions, which are too broad standing alone to oblige this court to regard them, are limited by the specifications which follow. Those specifications were disposed of by us, although no express allusion was made to the demurrer or the plea referred to in them; nor was any necessary, because the subject-matters of them were made unimportant by other parts of the opinion. After the de-

murrer and plea were disposed of, appellant Gregory answered the cross bill of Kemp Van Ee, proofs were taken touching the merits of Kemp Van Ee's claim, and the merits were heard by the court below. The assignment of errors, as already said, raised no question as to the merits of that claim, and we were, therefore, to assume that they were not in issue. As with reference to the petition as against Mary H. Pike, we have re-examined in this connection the assignment of errors and the points made in the brief against Kemp Van Ee, and find nothing which was not duly considered by us. After considering the several petitions for a rehearing, no judge who concurred in the judgments desires that a rehearing be granted, or permitted to be argued, and therefore orders will be entered as follows: After duly considering the petition for a rehearing, no judge who concurred in the judgment desiring that it should be granted, or permitted to be argued, it is denied. Mandate will issue forthwith.